**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **RICHARD PREIS, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 06-0360-WS-C** |
| | ) | |
| **LEXINGTON INSURANCE** | ) | |
| **COMPANY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

This matter is before the Court on the motion for summary judgment filed by defendant Lexington Insurance Company ("Lexington"), and on the plaintiff's motion for partial summary judgment. (Docs. 105, 106). The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 105, 107-09, 138-42, 145, 152), and the motions are ripe for resolution. After carefully considering the foregoing and other relevant materials in the file, the Court concludes that Lexington's motion is due to be granted in part and denied in part and that the plaintiffs' motion is due to be denied.

## BACKGROUND

The plaintiffs' home on Mobile Bay was damaged during Hurricane Katrina in August 2005, while insured under a homeowner's policy ("the Policy") issued by Lexington through co-defendants T & B, Ltd. ("T&B") and Edward Ladd. The home was ultimately demolished as ordered by local government, and the plaintiffs assert that their total losses approach $1.8 million. At least some of the damage was caused by flooding, and the plaintiffs recovered almost $600,000 under two flood policies issued by other entities. They now seek additional recovery under the Policy. Lexington relied on a

Policy exclusion for flood damage and offered the plaintiffs approximately $64,000 as compensation for wind damage.  The plaintiffs insist that the Policy covers flood damage and that, in any event, the bulk of their damages were caused by wind rather than flood.

The amended complaint asserts the following claims against Lexington:

- • Count One: Declaratory relief
- • Count Two: Breach of contract/reformation
- • Count Three: Bad faith failure to pay/investigate
- • Count Seven: Liability for acts and omissions of T&B and Ladd
- • Count Eight: Negligent/wanton training and supervision

(Doc. 60 at 11-21).

## DETERMINATIONS OF UNCONTROVERTED FACT

The Policy is labeled as "Homeowners 3 Special Form" and carries the following number on each page: "HO 00 03 04 91."  (Doc. 140, Exhibit 2 at LEX 006-23).  The Policy includes two sections.  Section I addresses property coverage, while Section II addresses liability coverage.  (*Id*. at LEX 007, 017).  Property coverage is of four kinds: Coverage A -Dwelling; Coverage B - Other Structures; Coverage C - Personal Property; and Coverage D - Loss of Use.  (*Id*. at LEX 007-08).

The Policy includes a number of endorsements, including one labeled as "Special Personal Property Coverage" and carrying the number, "LEX 15 31 08 01."  (Doc. 140, Exhibit 2 at LEX 049-51) ("Endorsement 15").  Under the heading of "Section I - Perils Insured Against," Endorsement 15 reads in pertinent part as follows:

> We insure against risk of direct physical loss to property described in Coverages A,  B and C for form HO 00 03 and for Coverage C only for form HO 00 04 and HO 04 06.
> We do not insure, however, for loss:
>> 1. Under Coverages A, B and C:
>> a. Excluded under SECTION I - EXCLUSIONS;
>> b. Caused by:
>>> (1)  Freezing of a plumbing ... system or of a household appliance ...;

(2) ...pressure or weight of water or ice ... to [certain structures];
(3) Theft ...;
(4) Mold, fungus or wet rot ...;
(5) Any of the following [including wear and tear, mechanical self-damage, smog, rust, smoke pollution, settling, and animals].

(*Id*. at 49-50).

A similar provision appears in the original Policy under the same heading, which reads in pertinent part as follows:

We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property.  We do *not* insure, however, for loss:
1. Involving collapse, other than as provided in Additional Coverage 8.;
2. Caused by:  [a list of items similar to that under Endorsement 15]
3. Excluded under Section I  - Exclusions.
Under items 1. and 2., any ensuing loss to property described in Coverages A and B *not* excluded or excepted in this policy is covered.

(Doc. 140, Exhibit 2 at LEX 011-12 (emphasis added)).

Among the Section I - Exclusions is the following:

1.      We do not insure for loss caused directly or indirectly by any of the following.  Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.
        ...
        c.      Water Damage, meaning:
                (1) Flood, surface water, waves, tidal water, overflow of a body of water, or  spray from any of these, whether or not driven by wind;
                ....

(Doc. 140, Exhibit 2 at LEX 013).

The Policy also includes an "Important Flood Insurance Notice," set in large type on a separate page, which begins as follows:

Your homeowners or dwelling policy does NOT provide coverage for loss caused by flood or mudslide, which is defined, in part, by the National Flood Insurance Program as:

        A general and temporary condition of partial or complete inundation of normally dry land areas from overflow of inland or tidal waters or from the unusual and rapid accumulation or runoff of surface waters from any source.

(Doc. 140, Exhibit 2 at LEX 040).

## CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §
1332.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2).

Summary judgment should be granted only if "there is no issue as to any material
fact and the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P.
56(c).  The party seeking summary judgment bears "the initial burden to show the district
court, by reference to materials on file, that there are no genuine issues of material fact
that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.
1991).  Once the moving party has satisfied its responsibility, the burden shifts to the
nonmoving party to show the existence of a genuine issue of material fact.  *Id.*  "If the
nonmoving party fails to make 'a sufficient showing on an essential element of her case
with respect to which she has the burden of proof,' the moving party is entitled to
summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986))
(footnote omitted).

"When the *moving* party has the burden of proof at trial, that party must show
*affirmatively* the absence of a genuine issue of material fact: it must support its motion
with credible evidence ... that would entitle it to a directed verdict if not controverted at
trial. [citation omitted] In other words, the moving party must show that, on all the
essential elements of its case on which it bears the burden of proof, no reasonable jury
could find for the nonmoving party."  *United States v. Four Parcels of Real Property,* 941
F.2d 1428, 1438 (11th Cir. 1991) (en banc) (emphasis in original); *accord Fitzpatrick v.
City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir. 1993).

"If the party moving for summary judgment fails to discharge the initial burden,
then the motion must be denied and the court need not consider what, if any, showing the
non-movant has made. [citation omitted] If, however, the movant carries the initial

summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "For issues on which the movant would bear the burden of proof at trial, the non-movant, in order to avoid summary judgment, must come forward with evidence sufficient to call into question the inference created by the movant's evidence on the particular material fact." *Id*.

Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions.[1]   Similarly, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp*., 43 F.3d 587, 599 (11th Cir. 1995).  Accordingly, the Court's review of the parties' submissions is limited to the portions to which they have specifically cited.  The Court's review is similarly limited to those legal arguments expressly advanced by the parties.

## I. Breach of Contract.

The plaintiffs' claim for breach of contract has two prongs: first, that the Policy

---

[1] *E.g., Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996) ("Rule 56 ... does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition."); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact."); *Lawson v. Sheriff of Tippecanoe County*, 725 F.2d 1136, 1139 (7th Cir. 1984) ("The judge was not obliged to comb the record for evidence contradicting the defendant's affidavit"); *Karlozian v. Clovis Unified School District*, 2001 WL 488880 at *1 (9th Cir. 2001) ("While pretext evidence may have been buried in [the plaintiff's] 242 page deposition, a district court is not "required to comb the record to find some reason to deny a motion for summary judgment.") (internal quotes omitted); *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so."); *see also* Local Rule 7.2.

covers some or all losses resulting from flood waters; second, that Lexington failed to pay for some losses resulting from wind.  After reviewing the interpretive rules applicable to the Policy, the Court addresses these arguments in turn.

### A.  Rules of Construction.

The parties agree that the Policy is to be construed under Louisiana law.  (Doc. 140 at 5; Doc. 145 at 3).  "The judiciary's role in interpreting insurance contracts is to ascertain the common intent of the parties to the contract. ...  If the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written. ...  The determination of whether a contract is clear or ambiguous is a question of law."  *Cadwallader v. Allstate Insurance Co.*, 848 So. 2d 577, 580 (La. 2003) (citations omitted).

"Ambiguous policy provisions are generally construed against the insurer and in favor of coverage. ... Under this rule of strict construction, equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer. ...  That strict construction principle applies only if the ambiguous policy provision is susceptible to two or more *reasonable* interpretations; for the rule of strict construction to apply, the insurance policy must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable."  *Cadwallader*, 848 So. 2d at 580 (emphasis in original) (citations omitted).  That is, "[a]n ambiguity in an insurance policy is said to exist when the pertinent provision can be reasonably construed in two different ways."  *Proshee v. Shree, Inc.*, 893 So. 2d 939, 942 (La. Ct. App. 3rd Cir. 2005).

In assessing whether a policy provision is ambiguous, "[w]ords and phrases used in an insurance contract are to be given their generally prevailing and ordinary meaning, unless they have acquired a technical meaning. ...  An insurance contract is construed as a whole and each provision in the policy must be interpreted in light of the other provisions so that each is given meaning.  One portion of the policy should not be construed

separately at the expense of disregarding other provisions." *Rolston v. United Services Automobile Association*, 948 So. 2d 1113, 1117 (La. App. 4ᵗʰ Cir. 2006) (citations omitted).

"An insurance contract ... should not be interpreted in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or to restrict its provisions beyond what is reasonably contemplated by unambiguous terms or achieve an absurd conclusion. ... The rules of construction do not authorize a perversion of the words or the exercise of inventive powers to create an ambiguity where none exists or the making of a new contract when the terms express with sufficient clearness the parties' intent." *Cadwallader*, 848 So. 2d at 580 (citations omitted).

### B. Water Damage.

The parties agree that the plaintiffs' property was damaged by flooding from Mobile Bay. The plaintiffs argue that the Policy is ambiguous as to whether it covers damage from flooding. They offer a number of imaginative arguments in support of this position, which the Court addresses in the order presented.

As a threshold matter, however, the Court notes the enormous handicap with which the plaintiffs begin this exercise. As discussed above, they are not at liberty to conjure up an ambiguity by looking only to an isolated provision of the Policy. Instead, the ambiguity must persist after viewing the provision in the context of the entire Policy, which includes the following pellucid warning on a separate page and in unusually large font: "Your homeowners or dwelling policy does NOT provide coverage for loss caused by flood or mudslide ...." (Doc. 140, Exhibit 2 at LEX 040). Quite an impressive showing would be required to render that crystalline disclaimer ambiguous, and the plaintiffs offer nothing impressive. On the contrary, their earnest but flimsy arguments could not demonstrate the existence of an ambiguity even if the Policy did not contain the quoted language.

**1. The missing conjunction.**

Endorsement 15 has been quoted above.[2]  The plaintiffs argue that, because "SECTION I - EXCLUSIONS;" is not followed by an "and" or an "or," the provision is ambiguous as to whether an exclusion from coverage requires that *both* subparagraph a. *and* subparagraph b. be satisfied.  The ambiguity must be resolved, they say, by inserting an "and," thereby requiring Lexington to show not only that the loss resulted from Water Damage as defined in the Section I exclusions but in addition that the loss was also caused by one of the items listed under subparagraph b.  (Doc. 140 at 8-10).

The Court does not find the provision to be ambiguous, because the plaintiffs' reading is not reasonable.  Were the plaintiffs' interpretation correct, loss resulting from Water Damage would nevertheless be covered unless the loss *also* resulted from one of the causes identified under subparagraph b., viz.: freezing, theft, mold or similar conditions, wear and tear, self-damage, smog, rust, industrial smoke, pollutants, settling and related movement, or animals.  That is, even were a new house swept from its foundation and dashed to bits by a raging flood, the plaintiffs' reading would provide coverage because no settling, mold, rust or so forth caused the loss.  Similarly, under the plaintiffs' argument the Policy would provide coverage for loss from war, despite the express exclusion therefor, except on the infinitesimal chance that the loss also resulted from one of the causes listed in subparagraph b.

---

[2]There seems to be some confusion as to whether Endorsement 15 affects only Coverage C or also amends Coverages A and B.  Lexington cites its Rule 30(b )(6) deposition for the proposition that only Coverage C is implicated, (Doc. 145 at 10-11), but at least once the deponent appeared to concede that the endorsement applies to Coverages A and B as well.  (Doc. 145, Exhibit 10, Moran Deposition at 119).  Moreover, Endorsement 15 purports to amend Coverages A and B with respect to form HO 00 03, and the Policy bears the number, "HO 00 03 04 91."  Lexington itself describes the Policy as the "HO3 form."  (Doc. 145 at 9).  Because the Court finds Endorsement 15 unambiguous, and because Lexington's argument apparently is offered only to limit the damage from an ambiguous endorsement, the Court need not resolve its reach at this time.

Nor does the plaintiffs' construction comport with the entirety of paragraph 1 of Endorsement 15.  No conjunction appears between sub-subparagraphs (1) through (5) of subparagraph b, which are set off from each other only by semicolons.  That is, if the plaintiffs' interpretation were accepted, to avoid coverage the loss would not have to fit an exclusion and involve merely *one* of the causes listed under subparagraph b.; rather, it would have to involve all *five* of them.  Thus, the exclusion for Water Damage would be ineffective unless the loss also resulted from the freezing of a device or system within the house, *and* the freezing, thawing, pressure or weight of water or ice on certain structures, *and* theft, *and* mold, fungus or dry rot, *and* one of the several options under sub-subparagraph (5).  The absurdity of the result adequately answers the plaintiffs' argument.

Finally, the plaintiffs' position is incompatible with the language of the exclusions, each of which expressly applies "regardless of any other cause or event contributing concurrently or in any sequence to the loss."  (Doc. 140, Exhibit 2 at LEX 013).  The plaintiffs' argument could succeed only by ignoring that clear provision, which basic rules of construction prohibit.

### 2.  The expansive application.

A "Composite Application" completed in 2003 has a box checked for "All Risk Contents."  (Doc. 140, Exhibit 11 at 1).[3]  The plaintiffs reasonably conclude from this that the Policy should have been "all risk" with respect to Coverage C.  More dubiously, they argue that, because the application does not identify any exclusions from contents coverage, the Policy is ambiguous as to whether there is an exclusion for Water Damage, at least under Coverage C.  (Doc. 140 at 11).

According to a leading treatise, "[a]n 'all-risk' policy creates coverage of a type

---

[3]The application presumably led to the inclusion of Endorsement 15, since the original Policy did not provide all-risk coverage, as defined in text, for personal property. (Doc. 140, Exhibit 2 at LEX 012-13).

not ordinarily present under other types of insurance, and recovery is allowed for fortuitous losses unless the loss is excluded by a specific policy provision ....”  10A L.R. Russ & T.F. Segalla, Couch on Insurance § 148:50 (3rd ed. 2007).  More succinctly, “the scope of coverage under an all-risk homeowner’s policy includes all risks except those specifically excluded by the policy.”  *State Farm Fire & Casualty Co. v. Von der Lieth*, 820 P.2d 285, 290-91 (Cal. 1991).  It therefore differs from a traditional policy. “All-risk insurance covers all risks that are not specifically excluded in the terms of the contract, and takes the opposite approach of traditional policies, sometimes called ‘named perils’ or ‘specific perils’ policies, which exclude all risks not specifically named.”  *Frank Coluccio Construction Co. v. King County*, 150 P.3d 1147, 1150 (Wash. App. 2007).

Lexington insists, without explanation, that the Policy is not an all-risk policy. (Doc. 145 at 7).  This seems doubtful, since Coverages A and B under the original Policy, and Coverages A, B and C under Endorsement 15, are all phrased broadly as providing coverage for physical loss to property other than as enumerated; they do not  contain a limiting list of insured perils.  At any rate, whether the plaintiffs received an all-risk policy, either in toto or with respect to Coverage C, is really inconsequential to Lexington’s motion for summary judgment.  The plaintiffs have brought no claim based on a failure to deliver the coverage requested, and it is far too late to inject such a claim into these proceedings, even had they moved for leave to do so.

Rather, the plaintiffs’ only use of the application’s request for all-risk contents coverage is to insist that the application’s silence as to any exclusions renders the Policy ambiguous as to whether any such exclusions exist.[4]  The threshold problem with this argument is that it assumes the application is itself a part of the Policy.  (Doc. 140 at 7). This assumption is tenuously based on the vague agreement of the Rule 30(b)(6) deponent with the proposition, “Or this would be part of the contract.”  (*Id*., Exhibit 4 at

---

[4]To the extent the plaintiffs imply that an “all-risk” policy automatically insures all loss with no exclusions, the authorities cited in text negate the suggestion.

50).  Even if the indefinite term "this" refers to the application, and even if the term "or" does not convert the proposition into a negative, the statement must be read in light of the deponent's immediately preceding testimony that, because the insurer "want[s] to know that the information is true at the time you're issuing the policy," "the application informs part of that contract."  (*Id*.).  The apparent meaning of the deponent's testimony is that, because the application provides information concerning such things as the insured property, the types of coverages requested, and the limits and deductibles requested, the insurer looks to the application to ensure that the ensuing policy comports with the application, and in that limited sense the information in the application becomes, by transfer, part of the policy.  The exchange cannot easily be construed as a concession that the application is itself a part of the Policy.

Nor would it matter if the deposition could be read as the plaintiffs desire.  "Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to or made a part of the policy."  La. Rev. Stat. § 22:654.  "Whether the application is part of the insurance contract is determined by the parties' intent as reflected by the words in the policy. ...  An application may become part of the insurance contract if sufficiently attached to or incorporated in the policy; however, the intent to make the application part of the insurance contract must be clearly expressed on the face of the policy."  *Peterson v. Schimek*, 729 So. 2d 1024, 1031 (La. 1999) (construing Section 22:654).  The application is not attached to the Policy, (Doc. 140, Exhibit 2), and the Policy does not even reference the application, much less express any intent to make it part of the Policy.  On the contrary, the Policy expressly identifies the papers that comprise it, and the application is not mentioned.[5]  Regardless of what

---

[5]"This declaration page with policy provisions and endorsements, if any, issued to form a part, thereof, completes the above numbered homeowner's policy."  (*Id.* at LEX 001).

Lexington's 30(b)(6) deponent may have thought about whether the application was part of the Policy, as a matter of law it could not be.

"A contract must be interpreted within its 'four corners' whenever the words of the contract are clear, explicit, and lead to no absurd consequences." *E.g., Peterson*, 729 So. 2d at 1031. That is, "the use of extrinsic evidence is proper only where a contract is ambiguous after an examination of the four corners of the agreement." *Taylor v. Brandner*, 928 So. 2d 751, 754 (La. App. 5th Cir. 2006) (internal quotes omitted). Extrinsic evidence cannot be used to create ambiguity, only to resolve an ambiguity appearing within the contract itself. Thus, the plaintiffs may not rely on the extrinsic evidence of the application to create an ambiguity in the Policy.

Nor would the application expose any ambiguity within the Policy even if it could be reviewed for that purpose. By its very nature, an application simply collects from the applicant basic information necessary for underwriting and issuing a policy; it does not serve to notify the applicant of all the terms and conditions the policy will contain. There is thus nothing inconsistent between an application that does not list exclusions from coverage and a policy that does. Likewise, since an all-risk policy by definition is subject to exclusions, the application's silence concerning exclusions under all-risk coverage introduces no ambiguity as to whether the coverage is subject to them.

### 3. The double negative.

The pre-Endorsement 15 "Perils Insured Against" language has been quoted above, with two usages of the word "not" highlighted.[6] The plaintiffs argue that "the inclusion of both 'nots' ... renders the exclusion language meaningless and ambiguous." (Doc. 140 at 12). They do not offer to explain how this could be so, and it patently is not.

---

[6]Of course, if Endorsement 15 superseded this provision, *see* note 2, *supra*, it is no longer in effect, eliminating the plaintiffs' entire argument directed to it. Because Lexington resists the conclusion that Endorsement 15 applies to Coverages A and B, however, the Court addresses the plaintiffs' argument.

The first "not" introduces the exclusions to coverage, while the second "not" limits the reach of certain exclusions.  Nothing could be plainer.

The plaintiffs' argument is largely impenetrable, but they indicate they have "two reasons" for finding ambiguity in this provision.  (Doc. 140 at 12).  Apparently, their second reason has to do with the "printing and presentation" of the quoted language, (*id*. at 11), but they fail to explain how it was defective or how it rendered the Policy ambiguous.  To the extent they mean to suggest that the final sentence is ambiguous as to whether "items 1. and 2." refers to the numbered paragraphs immediately above or to numbered paragraphs within "Section I - Exclusions,"[7] there is no ambiguity.  That sentence patently is not an extension of numbered paragraph 3 but is instead a separate, unnumbered paragraph, such that mention of items 1 and 2 is a reference to the numbered paragraphs above it.  Moreover, the sentence would be pointless if it referred to paragraphs 1 and 2 of Section I - Exclusions, because paragraph 2 of that section already contains precisely the same language.  (Doc. 140, Exhibit 2 at LEX 014).

### 4.  The restrictive exclusion.

The Policy's exclusion for Water Damage has been quoted above.  The plaintiffs argue that the provision excludes only "loss[es] that occur as a result of exposure to water over a period of time" (such as soggy sheet rock and personalty), while leaving losses "caused by the <u>force</u> of water" (such as collapsing structural members) fully covered. (Doc. 140 at 13 (emphasis in original)).  They do not disagree that "[f]lood, surface water, waves," etc., is broad enough to include both gentle and violent loss.  Instead, they insist that the phrase "Water Damage" limits the exclusion to loss by soaking.  (*Id*.).

The plaintiffs do not explain how the term "Water Damage" operates to  restrict the exclusion.  However, they concede that, were the defined term "Water" rather than

---

[7] To the extent they mean to suggest anything else, their argument is waived by their failure to articulate it with sufficient clarity to allow its consideration by the Court.

"Water Damage," the exclusion would extend to loss caused by the force of water.  (Doc. 140 at 13).  They thus imagine that adding the word "damage" somehow works the restriction, although how this occurs is left unstated.  In fact, the plaintiffs focus on a distinction without a difference; both the house with inundated wallboard and the house with collapsing structural members have experienced water damage.

Moreover, what is excluded is loss caused by flood and other listed forms of surface water, each of which (as the plaintiffs concede) on its face encompasses both gentle and violent loss.  The term "Water Damage" cannot change this result, because it merely provides a shorthand name (for use elsewhere in the Policy) for the various forms of water listed.  Had the defined term been "water," or even "watermelon" or "water buffalo," the exclusion would still be measured by the definition, not by the defined term.

The plaintiffs also argue that the exclusion does not reach damage caused by debris, even if the debris is carried by flood or other listed waters.  (Doc. 140 at 13, 20).[8] To the extent the argument is based on the "Water Damage" nomenclature — which is the only explanation the plaintiffs provide — the argument fails for the reasons stated above. To the extent the argument is based on some other, unarticulated reason, it is waived by the plaintiffs' failure to express it with sufficient clarity to permit its consideration.  At any rate, the Policy excludes loss resulting either "directly or indirectly" from flood, and loss from debris that strikes covered property when carried there by flood waters is loss caused indirectly by flood and thus excluded.  *Cf. Jones v. Washington National Insurance Co.*, 2 So. 2d 696, 697-98 (La. App. 2nd Cir. 1941) (where the policy excluded coverage for disability caused, directly or indirectly, by venereal disease, and where the plaintiff's accident aggravated a pre-existing aneurysm that resulted from syphilis, the amputation of his foot following a lancing of the aneurysm was an excluded loss).

---

[8]There is evidence that the plaintiffs' pier in Mobile Bay was broken up by the force of water and washed to, and into, the house.

**5.  The descriptive misnomer.**

The Policy provides, under the heading, "Section I - Property Coverages," as follows:

> COVERAGE D  - Loss of Use
> The limit of liability for Coverage D is the total limit for all the coverages that follow.
> 1.  If a loss covered under this Section makes that part of the "residence premises" where you reside not fit to live in, we cover, at your choice, either of the following.
> ...

(Doc. 140, Exhibit 2 at LEX 007-08).

The plaintiffs assert that this language makes Coverage D its own separate "Section" of the Policy and that, since Coverage D mentions no exclusions, there is no exclusion for Water Damage for purposes of loss-of-use coverage.  (Doc. 140 at 13-14). The assertion is patently wrong.  Coverage D is not a "section" but a provision.  The only "Section" of which it is a part is Section I, and it is to that section that the language, "this Section," refers.  Because Section I includes the Water Damage exclusion, that exclusion applies to Coverage D as it does to Coverages A, B, and C.

**6.  The windy opening.**

Coverage C of the original Policy, under the heading, "Section I - Perils Insured Against," provided coverage for specific, listed perils, including "windstorm or hail." (Doc. 140, Exhibit 2 at LEX 011-12).  The plaintiffs note that this covered peril "does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and rain, snow, sleet, sand or dust enters through this opening."  (*Id*. at LEX 012).  The plaintiffs conclude that, if wind created the opening(s) through which the flood waters entered the house, the quoted language provides them coverage for resulting loss to personalty inside.  (Doc. 140 at 14-15).

The threshold fatal defect in this argument is that it relies on language that was superseded by Endorsement 15: "The Perils Insured Against under ... Coverage C ... are deleted and replaced by the following ...." (Doc. 140, Exhibit 2 at LEX 049). Nor does the argument hold water even in the context of original Coverage C.

First, the quoted language addresses "rain, snow, sleet, sand [and] dust," not flood waters, so that it is facially inapplicable to the plaintiffs' situation. Second, Coverage C unsurprisingly states that it covers loss from the listed perils, including windstorm and hail, "unless the loss is excluded in SECTION I - EXCLUSIONS." (Doc. 140, Exhibit 2 at LEX 012). The Water Damage exclusion, of course, is one of those exclusions. Thus, damage to personalty from flood waters is unambiguously excluded, regardless of whether wind first created a hole in a wall through which the flood waters poured.

### 7.  The broker's gaffe.

Finally, the plaintiffs complain that defendant Ladd represented to them that "[e]verything is covered unless it is specifically excluded. Coverages include wind/hurricane, fire, vandalism, theft, etc." (Doc. 140, Exhibit 23). They argue that, "[i]f Ladd and T&B are agents of the Lexington, this representation by Ladd to Preis alters the terms of the coverage and creates an ambiguity." (Doc. 140 at 15).

The question of the relation of Ladd and T&B to Lexington is addressed in Part III but, even if they were Lexington's agents, Ladd's statement could neither alter the Policy terms nor create an ambiguity as to their meaning. As discussed in Part I.B.2, only those documents incorporated by reference are part of the Policy, and Ladd's letter is not mentioned anywhere in the Policy. As also previously discussed, only the Policy may be reviewed in determining whether an ambiguity exists. Because the letter is not part of the Policy, it is irrelevant to that threshold determination.

In summary, the Policy unambiguously excludes coverage for loss caused by flood

-16-

waters, whether or not driven by wind, and including loss caused indirectly by debris carried by flood waters.  Lexington is entitled to summary judgment with respect to the plaintiffs' claims for coverage for flood damage.

### C.  Wind Damage.

The parties agree that the Policy covers loss from wind.  Lexington contends that the amount of wind damage was limited to the $64,167.86 it tendered the plaintiffs.  The plaintiffs contend that wind, rather than flood, caused two walls of the house to collapse, which in turn required the structure's demolition, such that the damage attributable to wind is much greater than Lexington concedes.

"The insurer bears the burden of proving the applicability of an exclusionary clause within a policy."  *Blackburn v. National Union Fire Insurance Co.*, 784 So. 2d 637, 641 (La. 2001).  Thus, on motion for summary judgment Lexington bears the initial burden of showing affirmatively that no reasonable jury could find less flood damage, and more wind damage, than Lexington contends.

To meet its burden, Lexington offers the affidavit of its expert, Van Fisher, who states in conclusory fashion that, in his professional opinion, all damage but the roughly $64,000 tendered by Lexington was from flood, not wind.  (Doc. 105, Exhibit 9).  Assuming without deciding that an unexplained expert conclusion is sufficient to carry a movant's initial burden, the inquiry becomes whether the plaintiffs have come forward with evidence sufficient to call into question the inference created by Fisher's affidavit.

The plaintiffs rely on their own expert, William Sealy.  Using wind speed data from AccuWeather reports and formulae from American Society of Civil Engineers ("ASCE") 7, Sealy concluded that the nails used to connect the joists to the top plate were not structurally adequate to handle the resulting wind loads.  In one section of the house, this conclusion required the assumption that windows had broken, causing a "partial enclosure" that increased interior pressure.  In another section, the nails were inadequate

-17-

even without a partial enclosure.  (Doc. 140, Exhibit 17).  Sealy also noted that the nails attaching the top plate and the studs were not bent when the two separated, a condition suggestive of the roof being uplifted by wind rather than the wall being pushed inward by water (which would tend to bend the nails).  (Sealy Deposition at 144-45).   This evidence is plainly sufficient to call into question the inference created by Fisher's affidavit and thereby defeat Lexington's motion for summary judgment.

Lexington challenges the efficacy of Sealy's opinions in the following respects: (1) failure to identify the damage attributable to wind; (2) failure to state that the wind definitely lifted the roof from the walls, causing them to be unstable; (3) reliance on a gust calculation of 85 m.p.h., even though it is theoretically possible the house experienced just one gust that strong; (4) reliance on AccuWeather figures instead of some lower figure to account for AccuWeather's margin of error; (5) failure to include in his calculations a load duration factor of 1.6; (6) improper assumption of a partial enclosure; and (7) failure to determine whether flood water could have damaged the house.  (Doc. 145 at 13-16).

These objections are easily answered by reference to the parties' relative burdens. Because it is Lexington's burden at trial to establish that all of the damage it did not pay for was excluded water damage, the plaintiffs' only burden on motion for summary judgment is to provide evidence sufficient to call into question Lexington's minimization of wind damage.

Lexington's third, fourth, fifth and sixth objections are thus immaterial because they go at most to the weight to be afforded Sealy's opinions concerning the cause of the walls' collapse.  Indeed, they do not go very far even in that direction.  With respect to the third objection, Lexington concedes the house experienced at least one 85-m.p.h. gust, points to no evidence suggesting it is likely that only one such gust occurred, and points to no evidence that one such gust would be insufficient to separate the roof.  With respect to the fourth objection, Lexington concedes that the AccuWeather figures Sealy used are

reliable, but simply prefers that Sealy utilize some lower, possible figure that would be more favorable to Lexington.  With respect to the fifth objection, a jury could of course find that utilization of a 1.6 load duration factor was not required.  At any rate, Sealy's calculations reflect that, even using a 1.6 load duration factor, the force applied would still exceed the capacity of the nails in some areas.  (Doc. 145, Exhibit 17 at 8; Fisher Deposition at 128-29).  The sixth objection is based on the testimony of Fisher, who says only that he personally does not know one way or the other whether blown-out windows would result in a partial enclosure.  (*Id*. at 125-26).

Lexington's first and seventh objections proceed from, and depend upon, the false premise that the burden is on the plaintiffs to establish the line of demarcation between flood damage and wind damage.  On the contrary, on motion for summary judgment the plaintiffs need only bring into question the line drawn by Lexington.

Finally, Lexington complains that Sealy's report opined only that it was "mathematically possible" for the roof to have separated from the walls due to wind loads, so that the wind "could have" caused "a portion" of the damage to the walls that required demolition.  (Doc. 140, Exhibit 17 at 2).  Since all the plaintiffs need do at this juncture is draw Lexington's conclusion into question, the quoted language may well be sufficient to meet their burden.  The question is moot, however, since Sealy in deposition made clear that, given his calculations, the "mathematical possibility" that the roof separated due to wind loads was 100%.  (Sealy Deposition at 135-37).

In summary, Lexington is not entitled to summary judgment with respect to its determination that the damage resulting from wind did not exceed $64,167.86.

## II.  Bad Faith.

The amended complaint alleged that Lexington is liable for bad faith due to violations of two Louisiana statutes.  (Doc. 60 at 15-16).  After Lexington filed a motion for summary judgment explaining how it could not have violated those statutes, (Doc. 105

at 17-22), the plaintiffs abandoned all reliance on Louisiana law, arguing instead that Lexington is liable for bad faith under Alabama law.  (Doc. 140 at 22-25).  Lexington does not object to the plaintiffs' substitution, (Doc. 145 at 16), so the Court addresses their Alabama argument.

Alabama recognizes two broad forms of the tort of bad faith: the "normal" or "ordinary" case and the "abnormal" or "extraordinary" one.  *E.g., Acceptance Insurance Co. v. Brown*, 832 So. 2d 1, 15-16 (Ala. 2001); *Employees' Benefit Association v. Grissett*, 732 So. 2d 968, 976 (Ala. 1998).  The plaintiffs allege both forms of the tort. (Doc. 140 at 24).

Certain elements are common to both the ordinary and the extraordinary forms of bad faith: (1) the existence of an insurance contract between the parties; (2) an intentional refusal to pay the insured's claim; and (3) the insured's contractual entitlement to payment of the claim.  *State Farm Fire & Casualty v. Slade,* 747 So. 2d 293, 304, 316-18 (Ala. 1999).  Beyond this point, the elements diverge.

In the ordinary case, the insured must show  "the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason)." *Blackburn v. Fidelity & Deposit Co.*, 661 So. 2d 661, 667 (Ala. 1995) (internal quotes omitted).  A debatable or arguable reason is "a reason that is open to dispute or question." *Koch v. State Farm Fire & Casualty Co.*, 565 So. 2d 226, 229 n.4 (Ala. 1990). "When a claim is 'fairly debatable,' the insurer is entitled to debate it, whether the debate concerns a matter of fact or law."  *Davis v. Cotton States Mutual Insurance Co.*, 604 So. 2d 354, 358-59 (Ala. 1992) (internal quotes omitted).  The burden on the plaintiff arguing the absence of a debatable reason is so great that, "in the 'normal' case, a plaintiff's bad-faith claim may not be submitted to the jury unless she shows that she is entitled to a directed verdict on the contract claim."  *Alfa Mutual Fire Insurance Co. v. Thomas*, 738 So. 2d 815, 822 (Ala. 1999).

The extraordinary case is premised on  "countervailing policy considerations that

weig[h] in favor of the insured's right to have his claim properly evaluated and promptly paid," *Brown*, 832 So. 2d at 16 (internal quotes omitted), which would not be upheld were the insurer always able to escape liability by showing a debatable reason for its denial. Thus, "[t]he rule in [extraordinary] cases dispensed with the predicate of a preverdict JML [judgment as a matter of law] for the plaintiff on the contract claim if the insurer had recklessly or intentionally failed to properly investigate a claim or to subject the results of its investigation to a cognitive evaluation." *Id.* (internal quotes omitted).

The key issue in the ordinary bad faith case is whether, when the claim was denied, the insurer possessed a debatable reason for the denial. The plaintiffs identify the date of denial as March 3, 2006, (Doc. 135 at 2 & Exhibit 13), but they do not address the insurer's debatable reason. Lexington's February 8, 2006 unconditional tender of $53,135.96 was based on the recommendation of its independent adjuster, who made the recommendation after an on-site investigation which concluded that, while wind damaged the roof, the walls' collapse was caused by flood. (Doc. 145, Exhibits 33, 35). The adjuster's investigation, opinion and recommendation provided Lexington a debatable reason for refusing to pay any more on the claim, and in view of it the plaintiffs could not obtain judgment as a matter of law on their contract claim; indeed, they do not suggest that they could. Accordingly, their "ordinary" bad faith claim fails as a matter of law.

The plaintiffs argue that they can establish an "extraordinary" bad faith claim because Lexington did not begin to investigate the claim until after they filed suit (on March 8, 2006). (Doc. 140 at 25). As discussed above, however, Lexington's independent adjuster completed an investigation prior to Lexington's denial of the claim and the plaintiffs' institution of this action. The plaintiffs have not articulated how the adjuster's investigation, or Lexington's reliance on it, constitutes a failure to investigate for purposes of Alabama's bad faith law. What the plaintiffs do manage is a laundry list of perceived imperfections and anomalies in Lexington's handling of their claim, none of which do they tie to an actionable failure to investigate the claim. (Doc. 140 at 22-24).

The Court will not attempt to do so on their behalf.

In summary, Lexington is entitled to summary judgment with respect to the plaintiffs' bad faith claim.

## III.  Liability for Acts and Omissions of T&B and Ladd.

The plaintiffs argue that T&B and Ladd were Lexington's agents, such that Alabama law imposes vicarious liability on Lexington for their wrongdoing under the doctrine of respondeat superior.  (Doc. 140 at 25-30).  As discussed in the Court's order addressing the motion for summary judgment filed by T&B and Ladd, they cannot be liable to the plaintiffs because the applicable limitations period expired before the plaintiffs filed suit.  That ruling precludes the plaintiffs' derivative claim against Lexington for two reasons.

First, "on a claim against an agent, and against the principal solely on the theory of respondeat superior, a verdict in favor of the agent works an automatic acquittal of the principal ...."  *Stevenson v. Precision Standard, Inc*., 762 So. 2d 820, 827 (Ala. 1999).  Thus, "if all tort claims against an agent are dismissed with prejudice, then a subsequent tort claim based on the same facts will not lie against the agent's principal" unless the parties agreed to the contrary.  *Hundley v. J.F. Spann Timber Co.*, 2007 WL 80828 at *5 (Ala. 2007).  Without a viable claim against the agent, there can be no recovery against the principal under the respondeat superior theory on which the plaintiffs are traveling.

Second, the ruling in favor of T&B and Ladd was based on Louisiana's peremptive period for suits against insurance brokers and other Louisiana licensees for claims arising out of an engagement to provide insurance services.  La. Rev. Stat. § 5606.  Ladd holds such a license, triggering the statute, and the Court found all its other requirements satisfied.  Although Lexington apparently does not hold a Louisiana license, "[b]ecause the acts of an insurance agent are generally imputable to the insurer he represents, we conclude La. R.S. 9:5606's peremptive periods apply to the claims against [the insurer]."

*Klein v. American Life & Casualty Co.*, 858 So. 2d 527, 531 (La. Ct. App. 1st Cir. 2003); *accord Kobeszko v. State Farm Fire & Casualty Co.*, 2007 WL 1486315 at *1 (E.D. La. 2007). Likewise, because the plaintiffs seek to impute the conduct of T&B and Ladd to Lexington, the peremptive period applies to their claim against Lexington. As discussed in the Court's order granting the motion for summary judgment of T&B and Ladd, Section 5606 bars the plaintiffs' action, and the same ruling necessarily applies to the derivative claim against Lexington.

In summary, Lexington is entitled to summary judgment with respect to the plaintiffs' claim of vicarious liability.

**IV. Declaratory Relief.**

The amended complaint lists 11 declarations the plaintiffs would like the Court to make dealing with coverage. (Doc. 60 at 11-13, ¶ 37). The Court's rulings above dispose of most of them. In particular, the relief requested in subparagraphs C, G, H, I, J, K, L and M cannot be granted in light of the rulings herein. The relief requested in subparagraphs A, B and F remains in this action only to the extent it seeks declarations as to the extent of damage caused by wind rather than flood.[9]

**V. Negligent/Wanton Training and Supervision.**

Lexington did not address this claim in its motion for summary judgment and thus failed to meet its initial burden.

**VI. Plaintiffs' Motion for Partial Summary Judgment.**

The plaintiffs' motion addresses only whether T&B and Ladd are Lexington's agents for purposes of imposing vicarious liability on Lexington for their misconduct. Because, as discussed in Part III, Lexington cannot be vicariously liable regardless of

---

[9]Subparagraph C is directed to T&B and Ladd. There is no subparagraph E.

whether T&B and Ladd are its agents, the plaintiffs' motion is moot.

## CONCLUSION

For the reasons set forth above, Lexington's motion for summary judgment is **granted** with respect to the plaintiffs' breach of contract claim that the Policy covers all or any portion of loss from flooding; **granted** with respect to the plaintiffs' claims for bad faith and vicarious liability; and **granted** with respect to the declaratory relief sought in paragraph 37 of the amended complaint, subparagraphs C, G, H, I, J, K, L and M.  In all other respects, the motion for summary judgment is **denied**.  The plaintiffs' motion for partial summary judgment is **denied as moot**.

DONE and ORDERED this 20th day of June, 2007.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE